**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

**YOUR DREAMS, INC., d/b/a Club Goddess,**

        **Plaintiff,**

**-vs-**                            **Case No. 6:03-cv-1422-Orl-31DAB**

**City of Palm Bay,**

        **Defendant.**

# ORDER

Plaintiff Your Dreams, Inc., ("the Club") brought this case under 42 U.S.C. § 1983. The Club alleges that the City of Palm Bay ("the City"), under color of state law, violated the First and Fourteenth Amendments to the United States Constitution, when the City entered the Club's establishment and issued the Club's managers and employees a warning not to engage in "adult entertainment." The Court held a bench trial on February 28 and March 1, 2005, after which the parties submitted post-trial memoranda. The Court submits this, its findings and conclusions, pursuant to Federal Rule of Civil Procedure 52.

**I.**    **Background**

The Club is an establishment within the City's municipal limits. For its business model, the Club features scantily clad women who dance as a form of entertainment. The Club has operated, with limited interruptions, for over a decade in its current location.[1]

---

[1] The Club used to operate under the name "Flash Dancer," but now operates under the name "Club Goddess." The Club has retained the same ownership and offered the same form of entertainment at all times relevant to this proceeding.

The City is the political entity vested with municipal police power in Palm Bay, Florida. The Palm Bay area has experienced significant growth in the last two decades and now comprises the 22nd largest city in Florida. In the course of Palm Bay's development, the City, in the early 1990s, enacted an adult entertainment code, Palm Bay City Ordinances § 173.001 *et seq.* ("Code"), which regulates the time, place, and manner in which adult-oriented businesses may operate in Palm Bay. The Club is located in an area of the Palm Bay that, under the Code, is not zoned for adult-oriented business. Since the early 1990s, the Club's operations, which apparently began as a source of municipal discontent, have increasingly come into conflict with the City. The instant case is the second court battle in a long-running conflict.

### A.     The State-Court Case and the 1995 Settlement

When the Code was enacted, the Club was already operating as an adult entertainment business. The Code, as written, purported to require, among various other things, that businesses wishing to engage in adult entertainment: (1) obtain an adult entertainment license before offering adult entertainment, Code § 173.021; and (2) operate at least 1,000 (or, in some cases, 500 feet) away from specified land uses, *id.* § 173.050. In those and other regards, the Club's operations came into conflict with the then newly-enacted Code. In 1994, the Club filed a case in state court against the City ("the State-Court Case"). The main thrust of the State-Court Case was the Club's claim that the Code violated the United States Constitution in numerous ways, principally as an unreasonable burden on rights protected by the First Amendment.

To resolve the State-Court Case, the Club and the City reached a settlement agreement ("1995 Settlement"). The City amended the Code in certain respects and agreed to permit a less racy form of dance entertainment, which the City agreed would not constitute adult entertainment

under the Code. The Club's dancers were to wear certain dress elements, in a certain fashion, so as not to expose their vaginal areas and the areolae of their breasts; and the dancers, furthermore, were to perform their routines in such a way as not to violate the Code. The Club, in turn, agreed that the Code was constitutional and agreed to the foregoing and various other limitations the Code and the 1995 Settlement placed on the Club's operations. Ostensibly, this uneasy truce held for several years, until October 2003.

### B. The "Grand Reopening Event"

On October 2, 2003, after a hiatus for renovations, the Club held a grand reopening. According to the City, the manner in which the Club publicized this event violated the 1995 Settlement, and certain dancers at the event exposed their anatomical parts in a manner that violated the Code.[2] Regardless of whether such violations occurred, however, the City had been planning for months to put an end to the Club's dance entertainment.

Unbeknownst to the Club before and throughout its renovation project, the City had decided to repudiate the 1995 Settlement. Although the City had various opportunities to inform the Club of its intentions, the City, in an action almost certainly calculated to maximize the financial harm, waited to reveal its decision until the evening of Club's grand reopening. A team of mostly plain-clothed police officers delivered, in a non-public area of the Club, essentially the following official warning to Club's dancers and managers: if you engage in (or allow) dancing in the Club which in any way fits the scope of adult entertainment under the Code, the 1995

---

[2] Although unimportant in light of the Court's conclusions in this case, the Court doubts that any such dance violations occurred. The Court had significant concerns about the credibility of the City's witnesses on that point, and the City's conduct at the time does not evidence any tolerance that would explain the failure to arrest the supposedly offending dancers.

Settlement notwithstanding, you will be arrested. Understandably fearful of arrest, the Club's dancers soon left the premises. All the patrons on the scene also left, soon after being informed that the dance entertainment, which obviously drew them there, would not take place. The City's action along with the disappointment and departure of the Club's patrons effectively left the Club with no reason to remain open.

### C.     The Filing of the Instant Case and the Immediate Aftermath

On the following day, October 3, 2003, the Club filed the Complaint (Doc. 1) in the instant case, including claims directed only to the constitutionality of the City's conduct. With that, the Club apparently assumed that the City would stay its hand. The Club reopened and provided its brand of dance entertainment that evening without interference from the City.

A City agent, however, contacted the Club's manager the next day officially to warn again that the City would not permit the Club to operate as usual. This prompted the Club again to close but, this time, remain so for several days.[3]

On October 6, 2003, the Club filed a Motion for Preliminary Injunction (Doc. 2), and the Court, by request, set an expedited hearing for October 14, 2003. For the days leading up to that hearing, the Club remained closed. Upon appearance at the October 14th hearing, however, the City and the Club agreed to a stay of the instant case to permit a separate state-court action to proceed. The Club has thereafter remained open for business as usual. The instant case went essentially inactive, until the parties filed a Joint Status Report (Doc. 26) on March 15, 2004.

---

[3] In this action, the Club seeks damages occasioned by this closing. The issue of damages was bifurcated for later consideration.

### D.     The Claims in the Instant Case

Initially, and following the period the stay remained in effect, the Club has advanced the only claims for relief in the instant case.  Much later, the Club did file a Motion (Doc. 41) to amend its Complaint to add allegations of an unconstitutional pattern of police harassment occurring after the Grand Reopening Event and its immediate aftermath.  The Court, however, denied the Club's untimely request, which would have improvidently injected a few obscure occurrences into the legal nebulousness of the Club's existing claims for relief.  (Doc. 53).

Throughout later summary-judgment proceedings and trial, the parties maintained consistent positions, consistently failing to address the substance of one another's theories.  The Club denied every suggestion that its claims for relief might include a claim for breach of contract.  The City, for its part, petulantly maintained that no First or Fourteenth Amendment claim for relief could be advanced, the only conceivable claim was contractual, and there existed no basis for federal subject-matter jurisdiction.  The City did not file a counterclaim for rescission of the 1995 Settlement.  Instead, the City asserted, among other things, an affirmative defense that the doctrine of *res judicata* barred the Club's claims for relief.  (Doc. 27).  Not until filing its Closing Argument Brief (Doc. 114) did the Club clearly articulate its basic theory that the City's conduct around the Grand Reopening Event was a "prior restraint" in violation of the First Amendment.

## II.    Discussion

Both parties have sought resolutions in this matter on interim positions that are fundamentally inconsistent with their ultimate positions.  Although the City attempted to repudiate the 1995 Settlement before and at points during the instant case (contending that the 1995 Settlement is without force), the City's basic litigation position was that the 1995 Settlement

forcibly bars the Club's claim(s) and leaves no ground for federal subject-matter jurisdiction. And although the Club has consistently maintained that the 1995 Settlement remains in force, the Club's litigation position became indistinguishable from a constitutional challenge to the Code, which the 1995 Settlement confirms as being constitutional. With the Club's ultimate position and the City's interim litigation position, both parties materially rely on the 1995 Settlement. The Court holds the 1995 Settlement dispositive and a bar to the Club's recovery. In short, the Club's claim is barred by the doctrine of *res judicata*. That is not to say that this conclusion was obvious before trial, nor does it mean that the Court lacked subject-matter jurisdiction.

### A. Subject-Matter Jurisdiction

Fundamental to subject-matter jurisdiction, the Constitution provides, in relevant part, that: "[t]he judicial Power shall extend to all Cases, in Law and Equity, arising under this Constitution, the Laws of the United States, and Treaties made, or which shall be made, under their Authority . . . ." U.S. CONST. Art. III §2. Congress has generally provided, among other statutory bases for federal jurisdiction, that "[t]he district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331.

The Supreme Court has interpreted the proper exercise of "arising under" jurisdiction to require that it appear from the face of a plaintiff's complaint that the plaintiff alleges a cause of action based on federal law. *See, e.g.*, *Louisville & Nashville R.R. Co. v. Mottley*, 211 U.S. 149, 152 (1908) (holding that a federal-law defense, however likely to arise in response to a complaint, does not give rise to a cause of action based on federal law). Operation of this rule, known as the "well-pleaded complaint" rule, turns essentially on whether federal law or the Constitution is a proximate source of a right a plaintiff seeks to vindicate in court. *See Gully v. First Nat'l Bank*,

299 U.S. 109, 117-18 (1936) (Cardozo, J.) (in part, drawing a comparison between the rule's inquiry and "problems of causation"). It is well-recognized that a party's mere status as a federally recognized entity is normally not enough to raise a proper federal question. *See, e.g.*, *Tamiami Partners, Ltd. v. Miccosukee Tribe of Indians*, 999 F.2d 503, 507-08 (11th Cir. 1993) (finding lack of federal jurisdiction where plaintiff sued sovereign Indian tribe that might raise a disputed defense under federal law).[4] A plaintiff, in addition, may carefully tailor a claim to avoid stating a federal-law cause of action. *See, e.g.*, *The Fair v. Kohler Die & Specialty Co.*, 228 U.S. 22, 25 (1913) (Holmes, J.) ("the party who brings a suit is master to decide what law he will rely upon, and therefore . . . whether he will bring a 'suit arising under' . . . law of the United States . . ."). Accordingly, a federal-law issue may be too collateral or may simply not be stated on the face of a complaint. Nevertheless, the well-pleaded complaint rule provides no basis to ignore a claim clearly stated and directly hinged on a right actionable under federal law. "[I]f the plaintiff really makes a substantial claim under an act of Congress, there is [federal] jurisdiction whether the claim ultimately be held good or bad." *Id.*

In the instant case, the Club clearly stated and directly hinged a claim against the City on 42 U.S.C. § 1983, a federal statute that provides a cause of action against municipal governments for violations, *inter alia*, of the First Amendment. *Moreno v. Henckel*, 431 F.2d 1299, 1305 (5th Cir. 1970).[5] The Club asserted, in essence, that the City's conduct at the Grand Reopening Event

---

[4]*But cf.* 28 U.S.C. § 1349 (indicating, as an exception, that federal jurisdiction exists in actions by or against a corporation with more than half its capital stock owned by the United States).

[5]Decisions of the Fifth Circuit predating October 1, 1981, unless otherwise held by the Eleventh Circuit, are binding precedent on this Court. *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

unreasonably suppressed First Amendment protected expression. That was enough to give rise to a federal question, regardless of whether the claim warrants relief. *See Fair*, 228 U.S. at 25.

### B. The Parties' Positions in Perspective

To put the instant case's later development into proper perspective requires consideration of more than the parties' formal claims. Substantial claims were available but ignored. The evidence at trial confirmed that the City's position leading up to the Grand Reopening Event was that the 1995 Settlement was void, at least insofar as it allowed the Club to host its brand of dance entertainment. The Club's position, by comparison, was that the 1995 Settlement was valid and constituted a valuable contractual interest, apart from rights protected by the First and Fourteenth Amendments. The Grand Reopening Event marked a clash of these positions, which eventually became part of the subject matter of the instant case. From the clash, however, the only formal claims of weight (a cause of action and a corresponding affirmative defense) were asserted under the First Amendment and the doctrine of *res judicata*. The Club did not plead a supplemental breach-of-contract claim, nor did the City counterclaim for breach (recision) of the 1995 Settlement. Accordingly, the First Amendment claim stood, near the outset, in a no man's land of sorts – did the City suppress protected expression outside the scope of the Code or the 1995 Settlement; had the 1995 Settlement been rendered void, reopening the constitutional challenge raised in the State-Court Case; or were the parties each advocating for some different middle ground?

Well into the instant case, little was done to clarify the issues. After a six-month break resulting from the stay the parties requested, the City simply filed its Answer and Affirmative Defenses (Doc. 27). As the case thereafter unfolded, the first opportunity meaningfully to address

the issues occurred in regard to the City's Motion for Summary Judgment (Doc. 57).  The City's principle argument was that this case concerns, at best, a breach of contract and, as a breach of contract action, raises no basis for federal question jurisdiction.  That attempt to recharacterize the Club's complaint, although flawed as discussed above, did have the benefit of drawing out, among possible theories, a triable issue as to whether the City's conduct exceeded the scope of restriction the Club previously agreed was constitutional.  (*See* Doc. 75).

Before trial, it appeared possible the Club could prove that, at the Grand Reopening Event, City agents entered the Club in an overwhelmingly disruptive manner and issued a threat, which effectively and unreasonably restrained a large swath of First Amendment protected expression.  The City's conduct invited this uncertainty.

The case proceeded to a bench trial.  It proved, in sum, a waste of time and resources, in itself and in the events at issue.  A mass of testimony was introduced.  Mostly, it showed the City's elaborate and wasteful preparations to confront the Club with a warning that could easily have been delivered with a leaf of paper, some ink, an envelope, and a first-class stamp, all well before the Grand Reopening Event.[6]  The City's Manager managed to convey the sense of being a "details man," persnickety to the core, but incredibly ignorant of the Club's obvious plans and the ones the City was plotting.  Yet despite that disingenuous position, the City's conduct was not, in form,[7] shown to be a restraint on anything other than erotic dancing for tips.  The testimony worthy of

---

[6]If the City had used this method of warning, it could have avoided a great deal of uncertainty as to its conduct.  And, rather than risk litigation on the Club's terms, the City could have attempted to obtain a declaratory judgment rescinding the 1995 Settlement or (less likely) allowing the City to retain the benefits, but shed the burdens, of it.

[7]By form, the Court means the basic terms of the warning.  Otherwise, the City's timing and method of delivery bears the hallmark of a shrewd plan to deal a potentially devastating blow.  An astute manager – specifically, the City's Manager – would no doubt recognize the adverse impact this could have on an entity's daily finances and capacity to litigate following a large capital investment.

belief in the context established that the City's warning was fairly straightforward; in essence: if you engage in (or allow) dancing in the Club which in any way fits within the scope of adult entertainment under the Code, the 1995 Settlement notwithstanding, you will be arrested.  In this regard, the trial proved that, if the Club could support any claim, it was a challenge to the Code's constitutionality.  Unfortunately (for the Club), the constitutionality of the Code is a matter subsumed within the 1995 Settlement, which the Club, by all accounts, wants to uphold.

      **C.**     *Res Judicata* **and the First Amendment Claim**[8]

Under the doctrine of *res judicata*, a judgment in a case normally bars a party from pursuing in a later case claims that were raised or could have been raised in the earlier case. *Citibank, N.A. v. Data Lease Fin. Corp.*, 904 F.2d 1498, 1501 (11th Cir. 1990).[9]  "Where the parties consent to . . . dismissal based on a settlement agreement, however, the principles of *res judicata* apply (in a somewhat modified form) to the matters specified in the settlement agreement . . . ."  *Norfolk S. Corp. v. Chevron, U.S.A., Inc.*, 371 F.3d 1285, 1288 (11th Cir. 2004).

"A judgment dismissing an action with prejudice based upon the parties' stipulation, unlike a judgment imposed at the end of an adversarial proceeding, receives its legitimating force from the fact that the parties consented to it."  *Id*.  With regard to settlement agreements, a court should

---

[8]The Club mentions in its Closing Argument Brief that the City did not give the Club proper notice of the City's intentions.  To the extent the Club is asserting due-process claim under the Fourteenth Amendment, it is well-settled that a municipality's breach of contract does not rise to the level of a constitutional deprivation of property.  *See, e.g., Medical Laundry Serv., a Div. Of OPLCO, Inc. v. University of Ala.*, 906 F.2d 571, 573 (11th Cir. 1990).

[9]More specifically, *res judicata* "bars a subsequent lawsuit when four elements are present: '(1) there must be a final judgment on the merits, (2) the decision must be rendered by a court of competent jurisdiction, (3) the parties, or those in privity with them, must be identical in both suits; and (4) the same cause of action must be involved both cases.'"  *Id*. (citation omitted).

begin a *res judicata* analysis by determining what claims a settlement agreement purports to preclude from future litigation. *Id*. at 1290. After all, *res judicata* is an affirmative defense that can be waived, and such a waiver can be included in a contract. *Id.* at 1289.

In the instant case, a review of the 1995 Settlement indicates that, at least so long as it is not breached and remains in force, it precludes the Club from challenging the constitutionality of the Code.[10] Neither the Club nor the City has asserted a breach-of-contract claim, so the 1995 Settlement appears to remain fully binding on the parties. Indeed, the City's affirmative defense depends on it, and the Club has expressed a keen desire to preserve the 1995 Settlement. Accordingly, the Court concludes that the 1995 Settlement, as it stands, is *res judicata* as to the Club's challenge to the Code's constitutionality. Further, no waiver of *res judicata* has been established.

In the end, the basic proof at trial in this case showed that the City's agents sought to enforce the Code on its strict terms. The proof, in that regard, limited the viability of the Club's asserted claims to a single First Amendment claim. As the offending conduct was merely enforcement within the legitimate scope of the Code, the Club's potential claim has essentially been reduced to a challenge to the Code. Although they could have, neither party in this case has challenged the continued validity of the 1995 Settlement, so it operates, in conjunction with the City's affirmative defense of *res judicata*, to bar the Club's claim.

---

[10]Correspondingly, it gives the Club the right to engage in a form of adult entertainment otherwise inconsistent with the Code.

**III.     Conclusion**

The Court, from all this, assumes that the parties are war weary and disillusioned after the years of legal battles in their long-running conflict.  That might explain the entrenched positions on which litigation-by-waiver-and-default has ensued in this case.  The City, by default, has won this battle, but the war is clearly not over.  With the resulting stalemate, both parties are left to ponder the next step and the consequences of their actions (and omissions) in this case.  It is hereby

**ORDERED** that the Clerk is directed to enter judgment for the City and against the Club, with costs assessed against the Club.

**DONE** and **ORDERED** in Chambers, Orlando, Florida on June 15, 2005.

Copies furnished to:

Counsel of Record

GREGORY A. PRESNELL
UNITED STATES DISTRICT JUDGE